May I proceed, Your Honor? Good morning, Your Honor. I may please the court. My name is Walter Woodruff, and along with Mr. John Cialdoni, we represent the Paragon entities who are appellants in this matter. Your Honor, this case involves a truly unique fact pattern. It is unexampled, to my knowledge, in this Court's jurisprudence. We have Paragon that birth in Port Aransas, Texas. As a storm is approaching, Paragon officials are sedulously monitoring weather conditions and monitoring those to make necessary preparations. It's important to understand that until the day before the hurricane actually makes landfall, Hurricane Harvey in 2017, it's not until the day before that it's predicted to be a hurricane and to make landfall. In the days before that, they're all over the place. It goes from a named storm, it drops from being a named storm. My clients are making preparations by Thursday or Wednesday, the day before the storm, they make the decision to evacuate. They engage Signet Marine Services to perform that evacuation, and that evacuation is scuttled by facts beyond or circumstances beyond Paragon's control. The Coast Guard and the Port Authority had closed the port so they could no longer evacuate. They added some mooring lines at that point, got an in-situ inspection, and engaged into a commercial relationship with Signet Marine to place two tugs alongside the dead ship in hopes that it would hold in case the storm would cause the berth or the moorings to come undone. Now, for ten hours after the storm makes landfall, the moorings did hold, but when the eye of the storm passes over, our expert at trial testified that there was a microburst that went above any predicted wind speed, and that's what caused the dead ship to break free. The district court did find that Paragon took inadequate precautions. What did the court base that on, and how was that erroneous? Well, I think what the court based it on, Your Honor, to be candid, was four years in retrospect, using hindsight, after four years of discovery and the production of 10,000 documents, they went back and looked at what I think, I think the district court said things that my client could have done better. But the standard here is reasonableness. And reasonableness by this court's precedent in Boudoin v. J. McDermott, 281 Federal 2nd 81, says courts begin the examination of whether a vessel owner's actions were reasonable at the point it's reasonably certain a storm will hit. And when it became reasonably certain that the storm was going to hit, they engaged for a tow. They wanted to be towed out to sea. They were going to evacuate. For those of us who live along the Gulf Coast, you know the two major criteria when you're deciding to evacuate, when is the storm going to hit and where is it going to hit? And there's always a danger of evacuating prematurely because you may move yourself and your family into a greater cone of danger than that you're seeking to evacuate. So when it became clear they moved out, or they made the plan to evacuate, the order of priority is you take warm stacked vessels or manned vessels out of the bay before you take unmanned vessels. So there was a vessel owned by a company called Rowan. There was a breakdown. That breakdown was not foreseeable to anyone. Yet the district court said a prudent shipmaster would have foreseen that. And I would suggest to Your Honor, that's no longer a standard of prudence. That's a standard of prescience or clairvoyance. So wait, this argument is going to both force majeure and to maritime negligence? It does, Your Honor, because both examined critically, I think, what steps they took and whether those were reasonable. What about, am I right or wrong, just factually, that the four of the five drill ships did get out? This is the only one that didn't. No, that's not the only one. There were about five ships that stayed back that just... Drill ships. I don't know if they were drill ships, but they were vessels. And it's important because a drill ship is unmanned and unpowered. So they couldn't leave and they were forced out of there. Paragon personnel were ordered to leave the port. The personnel were. So they turned over control. And that's a major issue here because we think that the law of towage should apply because these two parties are not strangers. This is not... They're in privity of contract. My client yields or concedes control of this vessel to these people who have expertise. And it's in the context of a commercial relationship where they're getting compensation. And I guess, are you saying the district court didn't apply the law of towage or it misapplied it? It did not apply the law of towage. I think it applied general maritime negligence. And are the two inconsistent? In other words, does law of towage, once control is given, you have no duty whatsoever to the tower? Not that you don't have any duty, Your Honor, but it's much less duty. But here isn't the... After the trial, the court concluded, the evidence showed that there was negligence to the extent that you didn't inform them the mooring system was actually much weaker. I don't know if the district court goes as far as to say you didn't inform. They said you knew. And I think that my interpretation is what the district court said is having that knowledge, you should have acted sooner, earlier in the scenario than what you did. But that runs contrary to Boudoin. Boudoin says you don't measure reasonableness until it's certain that the storm is going to hit. But if you call for a ship assist, you want the tugs to keep you against the dock, it's pretty critical that the mooring system is going to work to aggregately be able to withstand whatever wind pressure at whatever angle, right? That's correct, Your Honor, but the record here shows that the moorings did perform within what they expected. It was rated to 80-something miles an hour, I believe, and it wasn't until that microburst came. This held. These moorings held. I'm going to stop you there because I thought the district court explicitly said the evidence didn't support the microburst. Didn't support the microburst, but what the record does support is that the ship held for 10 hours. It wasn't until the eyewall passed over this vessel. Okay. But wouldn't that be consistent with the mooring lines are inadequate, they weren't as represented to Genesis, and therefore they failed just after a lot of fatigue and overwhelmed the tugs? No, I don't think that's a fair assessment, Your Honor. I think there's no mooring system that would withstand a Category 4, and this hit right on the cusp of a Category 4. We knew we were rated for Category 1. We hoped that it would withstand Category 3. But the other thing that's getting sort of lost in this shuffle is the very risk that the moorings would not hold was what prompted us for engaging CIGNIT in the first place. So imagine the irony of, we have this concern. This is the assumption of risk, and you're claiming . . . I don't think it's an assumption of risk. It's going into a business transaction with eyes wide open. You paid them to do this. We paid them over a million dollars to do this. I guess the district court's answer was you paid them to come push to supplement a mooring system that turned out to be defective. Well, they knew what that mooring system was. I mean, they were the major operator in this. There had been some problems with the mooring in May or June earlier that year where they were there and they had a tug assist for them to address that. And they knew that we doubted . . . if we hadn't doubted that the mooring system would hold, we never would have had to engage these people in a commercial relationship and pay them a million dollars. It was the very essence of our doubt. Now, we hoped . . . And evidence came out at trial. Yes. Fingers crossed that this would be redundant. You doubted the strength of the mooring system, and they were aware of that? They knew that's why we were engaging them, and they knew there was a real risk that this would break free. That was testimony from the principal, Mr. Snyder. So we engaged them to guard against this risk. The risk comes to fruition. Not only do we not get the benefit of our bargain, but we pay them a million dollars and we become indebted to them in an amount that eclipses the liability we were seeking to avoid by causing damage to nearby submersible rigs. So this was just an upside-down transaction from the very start that absolutely made no sense unless . . . It only makes sense for Paragon to engage them if they had doubts that this was going to hold, and they got offered assurances. We're going to put two They had been through this before, and again, they're the experts. Right. Moving . . . just getting you back away from litigating the facts again as to what they knew and who knew what and who was responsible. Let's go back. What would the law of towage actually achieve for you here? Because the cases you cite, the several, tend to be where the tug's negligence causes damage. Here it's different, right? It is different, Your Honor, but it doesn't change the duty that the vessel owner owns to the tug company, and that's a much lower . . . And you heard in the case before, I asked for the best one. So what's the best one that articulates the lessened duty when you're under tow, and really helpful would be if you have one that contemplates a tow can include pressing against a dock. In other words, no motion involved. If you look at footnote 34, Your Honor, of both the U.S. Supreme Court and from this Court, and these are somewhat aged precedents because they haven't been challenged. Right. Which one would you particularly draw my attention to? Canadian Aviator v. United States, applying towage principles where the tow of a self-propelled vessel was transiting astern of a tug it was not attached to. Also, Stevens v. E. West Towing, which is this case . . . I'm sorry, this jurisdiction, applying towage law where the tug was tied onto a barge and awaiting orders, but not yet under tow. Okay. And in those cases, did the tug's negligence cause the damage, or did the ship . . . At least one of them, I believe. But again, Your Honor, and that's the wonky part of this is we really don't point to any fault that Signet made, and that kind of bleeds into or segues into the act of God. I mean, to the extent you apply towage law, or if you apply general maritime law, the first question is did they owe a duty? What duty did my client owe to a professional tow company? Certainly not a duty to provide them with a ship that they were guaranteeing would not break away from the dock, because if they were prepared to make that assurance, they would have made it to themselves and not hired two tugs to assist the ship. So you're saying you have both no duty as to whether the storm's going to hit, but also no duty as to the condition of your ship against the dock? No, I think that there's always some duty about the condition of the ship, but the unique circumstance here is it's that condition, and that condition could have prompted Signet to decline this. Signet was under no obligation to take on this tow. Signet could have said, look, we're familiar with these lines. We think it's dangerous. We're not comfortable doing this. We're going to put our people in danger. And as devastatingly catastrophic as this was, I'm thankful that we're dealing with what I will just call sacrifice metal and not the loss of human life here. But you know, so when you move to force majeure, even if my client had some duty under general maritime law or general towage law, we think there was a greater force at play here, and that was the force majeure. And the only thing that precluded the court from applying that defense was its attendant finding that my client did not act reasonably. And I would submit . . . I'm sorry. The delaying. Yes. But again, the delay, when you measure it from its proper origin under Boudouin, which is when you know the hurricane is going to hit, and you look at what they did, I think the court holds them to a standard of perfection. Look, they're drillers. They're not soothsayers. They're not meteorologists. They are sedulously . . . and I mean the court doesn't take any fault with the way they're monitoring this information. And by the way, they're monitoring the same information that Cygnet's getting. This is all from the National Hurricane Center. These are weather advisories. These are publicly available news sources. So when you look at what they did, it's hard to argue that it's unreasonable. I mean . . . How many, what did you call it, dead . . . Dead ships. Dead ships. Drill ships were in the harbor before the Harvey hit. How many got out? That information I do not know, but my co-counsel may have that information, and I would ask him to address that when . . . Do you want to get to the tariff? I do want to get to the tariff. So the other thing, Your Honor . . . and again, all of these were simple mistakes, but they have serious consequences. We don't take any issue with the meticulous fact-finding that the court made in its 83-page opinion. We just have a problem with the conclusions of law. That's why we advocate for de novo review. But the tariff unquestionably and unambiguously contains the provision that this agreement will not apply to dead ships. It will not apply to heightened port conditions, both of which unquestionably are present here. But the most important and critical aspect of it, the decisive aspect, is it says it can only be modified if in writing and signed off by both parties. Now the district court goes through an elaborate review of all the exchanges that go on, and again, all of this, we can't ignore the environment. The environment is very critical here, both on the tariff and what they're doing, because I mean, we're looking at all of this from upholstered chairs and the safest of all environments, but these people were making these decisions in real time when the environment is hectic. But that still doesn't . . . the tariff doesn't contain a disclaimer or a proviso that says it'll be in writing unless there's an exchange or the parties otherwise agree. It specifically imposes the requirement that it can only be modified in the event it is in writing and signed by both parties. And without the modification, we don't get away from the fact that the tariff by its own terms say it does not apply to dead ships, it does not apply to heightened port conditions, again, both of which are unquestioned. Much like in the force majeure, the two requirements are the weather has to be heavy and the shipmaster has to act reasonably. Again, the district court said there's no dispute, and I don't think my learned colleague across the aisle here is going to dispute that the weather conditions were heavy. So again, it all comes down to reasonableness there. And the tariff, I think it all comes down to was there a written modification. No, there were only verbal exchanges, email exchanges, but nothing was agreed to and signed off by the parties. And with that, Your Honors, I see my time is up, so if there are no more questions, I thank you. Thank you, Mr. Woodruff. Mr. Ettinger? Good morning, Your Honors. May it please the Court, my name is Robert Ettinger. I represent Signet Maritime Corporation along with Kevin Walters and Jim Hunter down in Bronzeville. I wanted to first try to comment on some of the questions that came up during the questioning of Mr. Woodruff about the microburst. The Court definitively determined that a microburst did not happen. And weighing all the evidence, we had weather experts testify and the Court determined that a microburst did not happen. Second, drill ships. The Court, I think, Judge Higginson, you said how many drill ships. The evidence is there were five drill ships along the Texas coast. There were two down by Brownsville. There were two in Corpus Christi by Rowan. And there was one by Paragon. Four got out of Harvey's Way. One did not. And they were all looking at the same weather information. And I'll get to that in a minute because with regard to the monitoring of the weather information. So what about just sort of the core legal point, which is Paragon's a little mystified. How can they have called you up to give tug, push, shove, pull services and then it turns around and they're the ones that are liable? Their mooring system, Your Honor. The mooring system was a blind man throwing darts. They had no idea what mooring lines were out there. I mean, no idea. They reported 13 three-inch Dyneema ropes and what the experts for Paragon and the experts for Cigna concluded is there wasn't one of those ropes there. There were a combination of ropes that were out there. Paragon had no idea what mooring lines were tying the DPDS. There's a case that says that the ship owner has to notify you when they've made a towage arrangement. Isn't it more on the towage? There's a duty to have to be reasonably moored, Your Honor. A duty to be reasonably moored. What's the case saying that? I'll have to dig that out for you, Your Honor. That's sort of an important point. It is. It is, Your Honor. It's a duty to be reasonably moored, and you're saying the district court here after the bench trial found that they breached that duty. They did. That's the case that's really helpful. I don't know if counsel can hand that to you, because you're not going to be getting back up. I'm sorry? You will not be getting back up. So if you can find that as you're talking, that'll be very helpful. We'll do so, Your Honor. We have the mooring lines, and what you'd be countenancing, because any vessel owner has a duty to reasonably moor its vessel. What you'd be countenancing is a vessel owner who doesn't even know what ropes they have out there. They don't know what they're tensioned to, and they have some admittedly bad ropes that are out there. Paragon's experts said those ropes don't match up at all. Paragon's experts said any reasonable ship owner would know what ropes are tying its vessel to the dock. Any reasonable ship owner would know that. Paragon had no idea. Let's say they had no mooring lines, but they called you up and said, we miscalculated on the hurricane. Are you willing to take this job or not? We need two tugs to push them against the dock. There are no mooring lines. Still, they'd be liable if your ships didn't have the power to do it? Or at that point, did you assume the risk? I can tell you that Signet would not take that job. Signet took the job on the representation that a good deal of the wind force would be absorbed by the mooring system. Is that the proof at trial? Not a good deal, Your Honor. The mooring system is what holds the ship to a dock during a storm. The evidence is, and the court cites the evidence, that our tugs, at the time a we were providing 3 percent. Because why were we out there? Here's what the testimony is as to why we were out there. The court concluded that Paragon contracted for Signet services not because it believed that absent such services, the DBDS-1 would surely become unmoored, but to provide additional support for the mooring system. Charlie Yester, who is the vice president of operations for Paragon, said, why were they out there? To reduce the tension on the mooring lines and to keep the DBDS under control if something happened. Koenig, the marine superintendent, said to hold the DBDS-1 to the dock, and our superintendent said to hold the ship in the moorings. When a storm comes in, the winds rotate, come around, they clock. The one wind you don't want is a beam wind coming off the dock, in this case, on the port side of the vessel. Because when you have that, that's when you have the greatest tension on the lines. At that particular time, although we were providing more force at other times, it was 3%. That's all the tension we could reduce. So you were depending on the mooring system. On a beam wind, you're depending on the mooring system. And how could you depend on a mooring system with a blind man throwing darts? They didn't know what they had. In the record, the trial evidence is, when it's coming back around, the beam wind hits, at that point, all your talks could have provided was 3%. That's all it did provide, Your Honor. Yes, that's all it did provide. What's the relevance or non-relevance of towage law? Is your position that it's inapplicable because that only applies when a tug is moving something? Or is your position that even under towage law, there was a duty breached? Both, Your Honor. Yes. There certainly is a situation. The law of tug and tow has boundaries, Your Honor. And the reason for that is it's got historical different risks that are associated with towage that you don't have when you're not towing. When we're doing a vessel assist, if you look at the definitions, they all talk about towage from cases, U.S. Supreme Court, from commentators, from other cases. They all talk about voyages. They all talk about movement. There's none here. There was no voyage. They didn't want to have a voyage on August 25th. There was no movement. They didn't want to have any on August 25th. And so, if you look at the, everything that's, you look at the cases, all cases where towage law is applied have a voyage or have movement. There wasn't expected to be any in this particular situation. But to get to your second point, Judge Higginson, if towage law does apply, and we've searched paragons briefs for this, what would change? What would change under towage law if the court applied it? Now, the court applied general maritime law to the events on August 25th. They applied general maritime law to the events on August 28th. But let's suppose, but on the events of August 25th, the court said, okay, in the alternative, how about towage law? No. The only thing that would change is if there were some unseaworthiness or weakness in the vessel that we didn't know about, that we did know about, it would, yes, the King Fisher marine case from this court said that. So, and then the court looked at that and said, well, there's nothing signet knew about it. They had no clue. They assumed a competent mooring system, and it wasn't there. And we haven't even talked about the tensions. They had no idea. The Genesis report said you have to tension lines, and it gave the tensions that were required. They had no tension meters on their lines. They had no tension meters on their winches. They had no idea what the tensions were. And so, they just flat, again, I've never seen anything like this where a vessel owner has no idea what they have out there. Paragon's experts said that what they do is they document all this. And of course you would document all this. Look at the mess we've been in. It took us four years to figure out what lines were on there because Paragon didn't save the lines after the accident. So, but to get to several points that are raised in Paragon's reply brief that of course we haven't been able to discuss, Paragon makes, keeps talking about hindsight, hindsight, hindsight, but every instance of negligence that this court found, it found before August 25th. There was no hindsight in any of this. How about the mooring ropes? They should have known what the mooring ropes were before the incident occurred. How about the tensions? Same way. They should have known it before this occurred. How about the delays in evacuating? The weather reports, the first weather report that came out was weather ops advisory number 22 at 4 a.m. on Monday. It said a tropical storm is going to hit in a cone of uncertainty that included this dock and it's going to hit on Friday. And then the next day on Tuesday they said it's going to be a cat one that's going to hit on August 25th on Friday. And the Port of Corpus Christi was right in the middle. Now what's Paragon doing when all this is coming on? What the other, what Rowan is doing and what the other competitors are doing is they're, they read these weather reports, they're getting their ships out, not Paragon. Paragon looks at this and says, ah, we're not going to worry about Monday, we're not worried yet, and on Tuesday we're not worried yet, even though orders to evacuate have been given by other drill ship owners at that date. And the interesting thing is they did that contrary to the recommendations of their marine superintendent. Their marine superintendent said, get out of here on Monday. Issue the order to evacuate. And then, and then it didn't happen. And then by Charlie Yester decided not to do it. And then Tuesday comes along and now the marine superintendent is getting frantic and he said, get this ship out. And they didn't do it. They waited until Wednesday to do it. And by Wednesday, as the court concluded in its opinion, it was too late to get out there. And the one guy that would know is the head of the pilots association in the port. And he testified at trial that if you had given that order to evacuate on Monday, there is a high likelihood you can get your vessel out. If you give it on Tuesday, it's your ship out. On Wednesday, he said there's a non-likelihood that it can get out on Wednesday. This is the head of the pilots association. Nobody knows more about the movements of vessels into and out of that port than Captain Jay Rivera. And the court cites his testimony as to the reason why they unreasonably delayed in issuing that order of evacuation. And if you're going to unreasonably delay, at least have a mooring system that, this is a quote from the court. It said, Paragon had no reliable basis to determine whether the mooring system could withstand a tropical storm, let alone a hurricane. That's the mooring system it could withstand. The mooring system, their own experts said you can easily design a cat one mooring system. You could design a cat two mooring system. You could design a cat three mooring system. It certainly can be done. There's no evidence in the record that Cignet inspected the mooring system itself? Who inspected it, your honor? Tugs. No, they couldn't tell. When you have a mooring system, with regard to the lines, you can't tell with synthetic lines what they are. They could be dyneema, they could be polypropylene, they could be polyethylene. You can't tell by looking at them. And also here's another thing you can't tell by looking at it. You have no idea what tensions are in those lines. I mean none. The only way you can tell what tensions are in those lines is to get a meter and check it. Well, Paragon didn't have any meters. And so we go out there and what could we do? We could look at the ropes, but we don't know whether they're polypropylene, we don't know whether they're dyneema, we don't know what they are. And we certainly have no idea what the tensions are. And so they turned this accident waiting to happen over to us because of just this blindness that they had with regard to their mooring system. The delay getting out made it stay in port, and then as a result of that they had this unbelievably bad mooring system on top of that. And none of that conduct that the court talks about is in hindsight. None of it. It all happens before August 25, 2070. All of it. So I'm not sure where Paragon is even coming from with regard to its hindsight argument. And I've got a little bit of time here, and you asked Mr. Woodruff some questions on the contracts. And here, the crux of this is Section 5 of the tariff. And Section 5 of the tariff says in heightened port conditions or with a dead ship. And what happened here was our president, Barry Snyder, had a conversation with Aldrich Schenkel, who was vice president of engineering for Paragon, on August morning of the 24th about what to do about bringing these two tugs up. And when they had this conversation, there certainly are two things that both Aldrich Schenkel and Barry Snyder knew. They knew the DPDS one was a dead ship. They knew that for sure. And with regard to heightened port conditions, well, the port had been closed. How much more heightened can you get there? Aldrich Schenkel, Paragon knew this. Signet knew this. And so they agreed to apply the tariff. That's what the court said. They agreed to apply the tariff. Okay. Despite two explicit waivers, they made an oral modification? They made an agreement, Your Honor, an oral agreement. That's presuming you can use parole evidence to modify these explicit? Oh, it's not parole evidence, Your Honor. No, no. Our tariff is published in 2016. This is all happening in 2017. The published tariff would disallow its application to these circumstances. Doesn't your argument and the district court's finding have to be that by virtue of the general counsel saying, okay, thanks, we'll take it, and then payment under it, that it was a modified? Yes or no? The oral agreement that was reached on August 24th was that the tariff will apply. And what everybody knew, that's Paragon and Signet knew on that date, is the DPDS one was a dead ship, and the port was closed. So knowing those two conditions existing, that the DPDS one's a dead ship and the port's closed, knowing that, Paragon says, okay, we agree. We agree to apply the tariff. And the agreement to apply in spite of the exclusions was confirmed by the general counsel, or you're saying it was confirmed by phone between the two? Well, it was the agreement for Signet to go forward and take the job under the circumstances because Signet wouldn't take the job unless the tariff would apply. And Paragon knew that. So they knew what those circumstances were. And you can, as the court says, you can, if some provision is in your favor, you can unilaterally waive that. And you're saying both those provisions were there for Signet? To protect Signet. Because Signet could look at a situation like, take this situation where the hypothetical, but no mooring lines. If that happened, Signet would look at that and they'd say, we're not going, you know, we're going to use the dead ship or heightened coast guard conditions as a way out of this. That's only to the benefit of Signet. It has nothing to do to benefit Paragon. Nothing to benefit Paragon. So, but the critical point here is that the president of Signet and the vice president of Paragon knew the conditions in Section 5 and still made the agreement to apply the tariff. Before you, okay, you're probably getting it now. Because you two know maritime law, towage law, negligence inside and out. So when you make, you state as an obvious proposition of law that a ship owner that's asking for a vessel assist has to provide a well moored boat. A reasonably moored boat. A reasonably, okay, and that's the case you've got right there? Is that right? Because you two may know it or you may disagree about it, but I don't know that. Yes. It's a well known principle in maritime law, both actually within tug tow and under the intermaritime law. Both. It applies to both. Okay. And it's a well known principle. The case that my colleague just gave me is the Signet case, 579F3, 491. And then there's a petition of the U.S. that's this court, 425F2, 991. But if you gave me five minutes on Lexis or Westlaw, Your Honor, this is like a well known principle that a vessel owner has a duty to reasonably moor a ship. All right. Thank you, Mr. Attenauer. Thank you. And for rebuttal, you can pronounce your name because I'm sure to mess it up, so . . . It is exactly as it's spelled. It's not. Good morning. I'm John Sheldoney, handling the rebuttal with Farragon, and I was also the counsel at trial with Mr. Attenauer. I'll try to be concise so I can cover all these points for you here in the rebuttal. You asked if there was any other vessels that were in port. Yes. There was two more unmanned drill ships that were in port. They were owned by Noble, and they were in the same port as the DPDS-1. The owner of that vessel, those two vessels, Noble, was concerned about what was happening with the DPDS-1, and they wrote to Barry Snyder. Barry Snyder's reply is available for you on the record at 37204-05. It's his email back to Noble, and I think it's a guiding point if you want to know how people act before something happens and how they act after something happens, and what is his comment. He tells them, Noble tells them, we're worried that the DPDS-1's going to break away. What are you going to do? Because our ships are exactly on the other side of the harbor. And he tells them, the full quote's available to you in the record, I was also worried about that issue, and I can assure you that Captain Gibson, that's their port captain, placed two of our top horsepower tugs to hold the DPDS-1 away from doing any harm to any of your rigs. Now if that isn't a risk of a breakaway, I don't know what is. Those rigs are on the other side of the harbor. But isn't the trial argument, we did have these two tugs, but we were, you know, especially when there's a beam wind, if they're pushing perpendicularly, they're not going to add much. It's critical that the mooring system take most of the weight. I think there's two points on bringing in the attending tugs. One of them is to do your best to hold yourself to the dock. The second is to control you if you break away. Do you want to simply have the vessel go in an uncontrolled state in the event that it breaks away? So you put two vessels to stay with it. So there's two objectives that are going on here. One is, do the best you can to control it at the dock. The second is, are you there to handle it if it breaks away? So I cite that first email from Mr. Snyder, there's one other point. I mean, I may be oversimplifying, but the next day problem, that's why there was joint liability, right? That tug didn't do much, but here the tug sinks. There's nothing it can do. Well, it sinks after the breakaway, right? Presumably because the drill ship collides with it. Yes or no? Oh, yes. Well, the drill ship pulled out. It actually, the tugs collided with the noble rigs is what happened. That's when they sank. That's when they sank. And so at this point, you're definitely out of holding it at the dock. You're under controlling it. Is there what both those things at issue? They were you'll see the testimony about Captain Gibson, who is their port captain. And he said, we were there to do two things. We were there to hold it and we were there to provide assistance in the event that it broke away. So the question then brings us to the points that you were asking was, there was the court's conclusion is whether there was a reasonable preparation by noble. And then the second is, what is the duty between the two parties? That's the towage issue. But I'll go to reasonableness first, and I'll try to put this down as tightly as I can. The first was that the court concluded that there was a problem with not evacuating early. And then the second conclusion was that they weren't reasonably prepared in how they moored the vessel. I can address the first one quickly for you is the evacuation early because it points us to a position that is essentially impossible. The the one point we know is that Thursday at seven o'clock in the morning, that is the departure date they are given. Take any decision by Mr. Yester that you like. Should he have done it earlier? Should he have done it on Monday? Should have done it on Tuesday? He got a slot. They were given Thursday at seven o'clock in the morning to depart. That date still today is a valid date to take your vessel out of the harbor. It was used to depart a ship from there. It was taken from Paragon, not from anything that Paragon could do about that about the testimony from the head of the Pilots Association. So the testimony of the Pilots Association still doesn't get to. He said, he said, I think that they could have done it earlier. But he also then testified. What did what did what did Rowan do? Rowan asked on Monday and Rowan cost a slot on Wednesday. That would be the equivalent of what you would expect from noble. You say, well, I'm noble from Paragon. Well, you could have asked on Monday. Rowan got the slot on Wednesday. Those air manned vessels. And that's a very important distinction because who are they going to take out of port? First, they're gonna take out of port the ships that have people living on board them before they're going to take out a ship that doesn't have anybody living on board it. And so those slots were given to Rowan. So if you ask on Monday, you were going to get Wednesday and they were going to be slotted on the same day as two vessels that had people living on board them. That would require you to tell the harbor pilots one. I suspect that one of those vessels is what happened. And the court said we should have anticipated that. And it is that point of anticipation that we say is the key era of hindsight. You had that second point. Your time's out. Judge Smith said I can ask. So the law that tells us the duty between these two people, just the case, that's all I need. I don't need a description. Your best have the case. I thought you said you were going to talk about the duty between the two. I did. I did. And you don't have a case, though. I don't have the case citation, but I know the duty. Well, go ahead. The duty is that you have to provide the vessel in a reasonably safe state at the beginning of towage. The towing company has the obligation to inspect it and that they're an expert in what they do. And then the position would be that they are not owed a duty for a vessel that cannot break away and that they would have an expertise in what they were doing. I wish I had more time. Thank you, though. Thank you, Mr. Cialdoni. Your case is under submission.